Shawn Leo, Esq. (321420)
LEO LAW OFFICE, APLC
401 W A Street, Suite 1150
San Diego, CA 92101
Tel: (858) 284-0660
Email: Sleo@theleolawoffice.com
 Attorneys for Plaintiff Social Life
Network, Inc.
[Additional counsel appear on
signature page]

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

SOCIAL LIFE NETWORK, INC.,

               Plaintiff,

      v.

LGH INVESTMENTS, LLC,
LUCAS HOPPEL,

    and

J.H. DARBIE & CO.
40 Wall Street, 30th FL
New York, New York 10005,

        Serve
        Robert Rabinowitz
        21 Mayhew Drive
        Livingston, NJ 07039

        Serve
        Robert Rabinowitz, CEO
        J.H. Darbie & Co.
        40 Wall Street, 30th FL
        New York, NY 10005,

          Defendants.

Case No. 3:21-cv-00767-L-MDD

**FIRST AMENDED COMPLAINT**

DEMAND FOR JURY TRIAL

1.      Plaintiff Social Life Network, Inc. ("Social Life" or "SLN"), through undersigned counsel, respectfully files this First Amended Complaint against Defendant LGH Investments, LLC ("LGH" and "LGH Investments"), Defendant Lucas Hoppel ("Hoppel") (collectively LGH and Hoppel are referred to as "LGH Defendants"), and Defendant J.H. Darbie & Co. ("Darbie") (collectively, all Defendants are referred to as "Defendants").

## 1.  **<u>INTRODUCTION</u>**

2.      LGH is a "death spiral" or "toxic" lender:[1] an unregistered securities dealer that sells convertible debt products to small public companies -- businesses that are often struggling to raise capital.[2] Toxic lenders like LGH are not the saviors

---

[1]  *See*  https://www.investor.gov/introduction-investing/investing-basics/glossary/convertible-securities (accessed 6/27/2021 at 3:56 p.m.); https://en.wikipedia.org/wiki/Death_spiral_financing (accessed 6/28/2021 at 1:23 a.m.).

[2] Based on a review of filings in the EDGAR database from 2018 to date, LGH has engaged in financing similar to this case on at least 36 separate occasions with at least 12 other microcap companies, resulting in approximately 156 securities transactions and sales of at least 82 million shares valued at $10,700,000.  **Exhibit 1** ("Transaction List").  The webpage screenshot in the Introduction was obtained from the Internet Archive Wayback Machine, which indicates that this webpage was captured -- and therefore live -- on January 10, 2019 (accessed July 13, 2021 at 4:36 p.m.).

of microcaps that they purport to be, nor is their business model legal. Rather, as reflected in recent Securities and Exchange Commission ("SEC")



prosecutions,[3] lenders like LGH avoid registering so they can evade regulatory oversight and thereby make predatory loans that generate outrageous profits.

3.     The toxic lending business model is simple:  unlike an investor or day trader, the lender uses the loan transaction to acquire the company's stock at a steep discount[4] (on top of the formal loan interest), which it dumps into the public markets as soon as possible, invariably causing a catastrophic plunge in the stock price.  In

---

[3] *See, e.g., SEC v. Almagarby,* 479 F. Supp. 3d 1266 (S.D. Fla. 2020); *SEC v. Keener,* 2020 WL 4736205 (S.D. Fla. Aug. 14, 2020); *SEC v. Fierro*, 2020 WL 7481773 (D.N.J. Dec. 18, 2020).

[4] The stock is generally obtained via one or more market-adjustable convertible debt products required by the lender for making the loan; this may be the promissory note itself or a warrant.

addition to being unlawful because the lender is not registered, these transactions may also run afoul of state prohibitions against usury, as in this case.

4.     The Agreements[5] in this case are a masterful example of toxic lending. Under the Agreements, LGH received approximately $14,417,780.88 worth of stock in exchange for a $100,000 loan, which Social Life repaid, with interest, within seven months.  LGH's combined return on the Note and Warrant was an unfathomable ***7,226.6% APR.***[6]

5.     At the same time, the harm to SLN and its shareholders is nearly incalculable.  During the period that SLN engaged with toxic lenders, its stock price plummeted from $0.15 on April 11, 2019, to $0.0059 on June 30, 2021, a 96% reduction.  But the dilution of ownership did even greater damage:  as a result of the new issuances, the April 2019 shareholders saw their ownership of the company dilute to ***1.7%*** of what they held prior to the new issuances.

6.     The Agreements are patently unlawful.  Among other things, they violate the prohibitions on usury in the California Constitution and were made in

---

[5] "Agreements" means the documents executed by Plaintiff in favor of LGH Investments on April 11, 2019:  a Securities Purchase Agreement ("SPA"), **Exhibit 2**; a Convertible Note ("Note"), **Exhibit 3**; and Common Stock Purchase Warrant ("Warrant"), **Exhibit 4**.   The transaction resulting in the execution of the Agreements is hereinafter referred to as the "April 2019 Transaction."
[6] Plaintiff's analysis of the transactions in this case is based on the information currently available to counsel; proof will require expert testimony at trial.

violation of section 15(a) of the Securities Exchange Act of 1934 ("Act"). Plaintiff seeks recission of the Agreements,[7] disgorgement of all interest payments pursuant to California Civil Code § 1916.12-2, the return of all stock obtained by the Defendants via the Agreements, and such other relief as requested Social Life in its Prayer for Relief herein.

## II.   <u>JURISDICTION AND VENUE</u>

7.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because Plaintiff is asserting a claim under the Act.

8.     This Court also has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 because the action is between citizens of different states and the amount in controversy exceeds $75,000.00.

9.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

10.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2) because Hoppel is a permanent resident in this District and because a substantial part of the events giving rise to this action occurred in this District.

---

[7] The cause of action herein lies under § 29(b), not under § 15(a). See § 29(b) of the Act (15 U.S.C. § 78cc (b)).

11.     Notwithstanding that the Agreements should be voided and rescinded in their entirety by the Court for the reasons stated herein, LGH  should be estopped from denying that jurisdiction or venue is proper in this Court because LGH agreed to it in the Note.  *See* Note ¶ 8 ("Applicable Law and Venue").

### III.   PARTIES

12.     Plaintiff Social Life is a microcap startup company that licenses a Software-As-A-Service internet platform to various industries. It is a Nevada corporation with its principal place of business at 8100 E. Union Ave., Suite 1809, Denver, CO 80237.

13.     In April 2019, Social Life had three officers and three employees.

14.     Social Life stock trades on the over-the-counter ("OTC") market, where the stocks of early-stage, developing companies -- too small for the major exchanges -- are traded.

15.     In April 2019 SLN stock traded on the middle-tier "OTCQB" market, but the drastic price declines caused by Social Life's dealings with predatory lenders, including LGH, have relegated its stock to trading on the lowest tier of the OTC market, the so-called "pink sheets."

16.    Upon information and belief, Defendant Hoppel is a permanent resident, domiciled, and therefore a citizen of, the state of California, who resides at 6326 Caminito Estrellado, San Diego, CA 92120.

17.    Defendant Hoppel has a long history of toxic lending.  Between 2015 and 2018 Hoppel was a known purveyor of market-adjustable financing and acquired at least 40 market-adjustable securities from at least 17 microcap companies.  Exhibit 1.

18.    Hoppel incorporated LGH Investments in September 2018.  LGH Investments is a Wyoming limited liability company with its place of business listed at 30 North Gould Street, Suite R, Sheridan, WY 82801.

19.    Hoppel is the president and managing member of LGH..  Most of Hoppel's financing activities have been effected through LGH Investments since he incorporated it.

20.    The address located for LGH Investments – 30 North Gould Street, Sheridan, Wyoming – is home to an entity called "Wyoming Corporate Office, LLC," which offers *virtual office space* and mail forwarding to out-of-state companies seeking to establish a "Wyoming nexus" for purposes of income

taxation.[8] Given the nature of its "office" arrangement, it is unclear whether LGH effects any transactions from Wyoming.

21.   All of the LGH Investments transactions, negotiations, and communications in this case appear to have been from, or executed by, Hoppel in California.  The transfer agent lists LGH Investments with the address 6170 Tiki Ct., San Diego,  CA 92130.

22.   As LGH's president and managing member, Hoppel possesses the power and authority to directly control LGH's statements, representations, and decisions.

23.   The relevant databases confirm that no SEC dealer registration exists for LGH or Hoppel, and that none existed in April 2019.[9]

24.   At all times relevant hereto, neither LGH Investments nor Hoppel was registered as a broker-dealer with the California Department of Financial Protection and Innovation.

25.   Defendant Darbie is a New York corporation, with its principal place of business at 40 Wall Street, 30th Floor, New York, NY 10005.  Darbie is an SEC

---

[8] https://www.wyomingcorporateoffice.com/wyoming-virtual-office (accessed July 15, 2021 at 3:25 p.m.).

[9] https://brokercheck.finra.org/search/genericsearch/firmgrid; last visited June 9, 2021.  Because California broker-dealer registration itself requires FINRA/SEC registration, a person not licensed with FINRA is not licensed in California.

registered broker-dealer: Central Registration Depository No. 43520, SEC No. 8-50335.

## IV.   FACTUAL ALLEGATIONS

### A.   *Darbie Arranged the April 2019 Transaction Knowing It was Unlawful*

26.   In 2019, Social Life was in need of money to pay for its business operations and marketing.

27.   In April 2019, Social Life hired Darbie as a finder, to connect it with potential lenders.

28.   Darbie arranged the April 2019 Transaction resulting in the execution of the Agreements.

29.   Although acting as a finder, Darbie was still a licensed broker- dealer and had a duty to ensure LGH's eligibility to buy and sell securities from SLN.

30.   As alleged in greater detail, *infra,* the April 2019 Transaction was unlawful under 15 U.S.C. § 78o(a)(1) and California Corporations Code § 25210(a) because LGH was required to, but did not,  register as a dealer with the SEC and the California Department of Financial Protection & Innovation.

31.   Upon information and belief, as part of its due diligence prior to the April 2019 Transaction, Darbie conducted an inquiry as to whether the transaction would violate federal or state securities laws or regulations.

32.    As a result, Darbie would have known that the LGH Defendants were highly active in the buying and selling of securities, and that none of the LGH Defendants was registered as a dealer with the SEC or the California Department of Financial Protection & Innovation.

33.    Darbie therefore had reason to believe that the Agreements were unlawful.

34.    Social Life paid Darbie for arranging the April 2019 Transaction.

35.    Darbie went forward with the April 2019 Transaction, and accepted payment from Social Life for arranging it, despite the fact that the Agreements were unlawful under both federal and California law.

### B.    The Transactions in this Case are Typical of the LGH Business Model

36.    The LGH business model manifests numerous and substantial characteristics of dealer activity, consistent with ongoing SEC prosecutions.

37.    Chief among these is  reaping profits from the continuous buying and selling of securities for its own account.

38.    The April 2019 Transaction that effected the Agreements in this case was a transaction in securities.  As defined in the Act, (1) the "inducement" shares, (2) the right to convert debt under the Note, (3) the stock purchase warrants and (4) the securities purchase agreement, are all themselves securities.

39.   In addition, LGH has engaged in numerous other securities transactions related to the Agreements ("the Related Transactions"), including the exercise of the warrant and the sale of millions of warrant shares into the public market.

40.   Investment is not part of LGH's business model.

41.   Unlike an investor, LGH did not hold the Warrant and wait for Social Life's stock price to rise above the exercise price.   Instead, LGH, through its Warrant 'adjustment' provisions, drove the strike price down so low that the market price of the stock was barely relevant.

42.   Unlike an investor, whose interests are aligned with the company in which it invests, LGH's interests are not aligned with those of Social Life.   The anti-dilution provisions in the Warrant capitalized on intermittent craters in the stock price and enabled LGH to profit even when the stock price was falling.

43.   LGH's business model is similar to the one used by the defendants in *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786 (11th Cir. 2015) and *Keener*.

44.   Upon information and belief, as soon as LGH received the newly-issued SLN warrant shares, it immediately sold them into the marketplace to reap a substantial profit, even while SLN's trading price was falling.

45.   LGH securities purchases are part of an ongoing business.

46.     As mentioned above, LGH operated a website on which it held itself out to the public as an "investor" providing "finance solutions for microcap companies."  *See* LGH Website in Introduction and accompanying discussion.

47.     Upon information and belief, the only "finance solutions" that LGH has offered to microcap companies are toxic loans involving the purchase of market adjustable securities like the one in this case.

48.     Upon information and belief, LGH proceeds in the same manner for every variable-rate/market adjustable convertible note or warrant it obtains: through the conversion of debt or the cashless exercise of a warrant, LGH acquires large blocks of newly-issued shares directly from the issuer at a steep discount to the market price.

49.     Upon information and belief, once LGH obtained the stock it did not hold the shares, but it immediately sold large blocks of stock into the market to reap the difference between the discount and the market price.

50.     A review of the SEC's EDGAR database shows that LGH has purchased similar convertible securities on at least 36 occasions, from at least 12 other microcap companies since it was created in 2018.   *See* Transaction List, Exhibit 1.

51.     A review of the SEC's EDGAR database also shows that, prior to incorporating LGH, Lucas Hoppel personally engaged in securities transactions

with microcap issuers using the identical business model to that used by LGH. Between 2015 and October 2018, Hoppel obtained at least 40 convertible notes or warrants from at least 17 different microcap companies.  *See id.*

52.    Selling shares absent investment intent (*i.e.*, while trading prices are actively falling) is a characteristic of a dealer.

53.    Upon information and belief, LGH also purchased "aged debt" convertible debt securities from other debt holders, similar to the practice under scrutiny in *Almagarby*.

54.    LGH drafted the Agreements in this case.  Upon information and belief, LGH used only its own agreements in all transactions.

55.    LGH uses a brokerage account with Vision Financial Markets, LLC ("Vision") to facilitate sales of the large blocks of newly-issued shares it acquires. Vision serves large institutions and other broker-dealers, as a so-called inter-dealer broker.[10]  The use of an inter-dealer broker for securities transactions is another factor that the SEC considers to be indicative of a dealer.

---

[10]*See* www.investopedia.com/terms/i/inter-dealerbroker.asp (accessed July 15, 2021 at 10:57 p.m.).

56.    LGH made use of the mails, email, and other instrumentalities of interstate commerce to effect the April 2019 Transaction and the Related Transactions.

57.    LGH transacted in securities within the State of California through its principal, Defendant Hoppel.

58.    By failing to comply with the dealer registration requirements of the federal and California securities laws, LGH purposefully "operated under the radar" to avoid important regulatory obligations that govern dealer conduct in the marketplace, including submitting to regulatory inspections and oversight, following financial responsibility rules, and maintaining books and records.

### C.    The Note Provided LGH Investments with 67.6% APR Interest on Its Loan to SLN

59.    Under the Agreements, LGH Investments lent $100,000 in cash to Social Life in return for (1) a Note for $110,000; (2) 150,000 'inducement shares' of Social Life stock; and (3) a Warrant for 412,500 shares of Social Life stock. *See* SPA at § B.

60.     Social Life was obligated absolutely to pay LGH Investments the amount of $110,000[11] plus 7% interest, due in full on the stated maturity date of the Note, November 11, 2019.  Note at 1.

61.     As additional consideration for the $100,000 loan, Social Life was obligated to issue to LGH Investments 150,000 shares of common stock as "inducement shares."  On April 11, 2019 Social Life stock was trading at $0.145 per share, giving the inducement shares a fair market value of $21,750.

62.     Although these 150,000 shares were restricted from sale for six months after issuance,[12] their value was guaranteed to be the same (or greater) by the time the shares became freely trading because Social Life was obligated to maintain the value of the shares by issuing "true up" shares to LGH Investments if the share price had dropped by the time of sale.  SPA at 1.2.

63.     On November 11, 2019, seven months after receipt of the $100,000, *Social Life repaid the loan in full.*  With stated 7% interest and original issue discount ("OID"), Social Life's payoff to LGH Investments was in the amount of $117,700.  Adding to this the $21,750 value of the inducement shares that were paid

---

[11] The extra $10,000 charge is designated in the Note as an original issue discount. Note at 1.

[12] Unless the stock is registered, newly issued shares would be restricted from sale under the six-month holding period of Rule 144.  *See* 17 C.F.R. § 230.144.

up front, Social Life paid LGH $139,450 for a seven-month loan of $100,000, reflecting an annualized interest rate of *67.6%*. This figure does not include the value conveyed by the Warrant.

### D. Under the Warrant, LGH Investments Received 7,159% APR Interest on Its Loan to SLN

64. As further consideration for the loan, Social Life was obligated to convey the Warrant: a five-year stock purchase warrant giving LGH the right to purchase up to 412,500 shares of Social Life common stock ("Warrant Shares") at an exercise price of $0.20 per share. At the time of issuance, Social Life stock was trading at $0.145 per share.

65. Assuming the Warrant can fairly be called a "warrant," its provisions are *not at all typical of a warrant.*

66. Generally, a warrant with a strike price (25%) higher than the market price at the time of issuance is considered "out of the money," and, by most measures, would be deemed to have no intrinsic value at the time of issuance.

67. Although it appeared to be essentially valueless at the time of issuance, in fact, the various "adjustment" or anti-dilution provisions buried in the fine print

of the Warrant operated to ratchet down the exercise price to far less than $0.20 shortly after issuance.[13]  *See* Warrant at 2.2.

68.     Further, LGH was simply a debtholder, with no equity ownership position that was ever capable of being diluted.

69.     The purpose of the "full ratchet" anti-dilution provision in the LGH Warrant was therefore simply to guarantee to LGH an exponentially greater number of shares than could be obtained at a nearly-zero exercise price.

70.     Social Life was given less than two hours to review the Agreement documents, which was constituted by, *inter alia,* a convertible promissory note, securities purchase agreement, stock purchase warrant, as well as several other peripheral documents.

71.     In total, there were 88 pages and 11 documents requiring review, each made up of single-spaced paragraphs containing difficult and complex terms.

72.     SLN was not assisted by an attorney when it reviewed the documents.

73.     The adjustment provisions in the Warrant are not customary in the industry and are written to be so confusing as to be nearly incomprehensible.

―――――――――――――――

[13] Typically, an anti-dilution provision acts as a buffer to protect investors against their equity ownership positions becoming diluted or less valuable, *see* www.investopedia.com/terms/a/anti-dilutionprovision.asp (accessed 6/27/2021 at 11:08 p.m.).

74.    The adjustment provisions in the Warrant are procedurally and substantively unconscionable.

75.    The face of the Warrant provides that LGH is entitled to purchase only

THIS WARRANT AND THE SHARES ISSUABLE UPON EXERCISE OF THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.   THIS WARRANT AND THE SHARES ISSUABLE UPON EXERCISE OF THIS WARRANT MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT OR APPLICABLE EXEMPTION OR SAFE HARBOR PROVISION.

**COMMON STOCK PURCHASE WARRANT**

**SOCIAL LIFE NETWORK, INC.**

Warrant Shares: 412,500                                    Initial Issue Date:  April 11, 2019
Aggregate Exercise Amount: $82,500

THIS COMMON STOCK PURCHASE WARRANT (the "Warrant") certifies that, for

up to 412,000 shares, yet LGH was able to and did use the Warrant to acquire *hundreds of millions of shares* at almost no cost.

76.    SLN was LGH was able to acquire hundreds of millions of shares by way of provisions that are unreasonably hidden within the terms of the Warrant.

77.    More than a year after Social Life paid off the loan, LGH began exercising the Warrant.  On December 5, 2020, LGH notified Social Life that, due to the low stock price of .0001 on recent dates, LGH's Warrant was now for 825,000,000 shares with a strike price of .0001.

78.    On December 7, 2020, Social Life's average trading price was .0057 per share. On the evening of December 7, 2020, LGH submitted a notice of exercise

for 200,000,000 warrant shares, which, using cashless exercise, entitled LGH to 186,666,667 shares of Social Life stock.

79.     On the next trading day, December 9, 2020, 847,900,910 shares traded in Social Life stock and the average trading price was $0.00265.  Using .00265 per share, the 186,666,667 shares LGH acquired from the December 7 exercise had a fair market value of $494,666.66.

80.     On December 15, 2020, LGH obtained, via cashless exercise of the Warrant, 106,451,613 shares of Social Life stock, with a fair market value of $361,935.48.

81.     On January 4, 2021, LGH obtained, via cashless exercise of the Warrant, 114,545,455 shares of Social Life stock, with a fair market value of $326,454.55.

82.     On February 10, 2021, LGH obtained, via cashless exercise of the Warrant, 199,242,424 shares of Social Life stock, with a fair market value of $4,911,325.75.

83.     On April 6, 2021, LGH obtained, via cashless exercise of the Warrant, 204,004,854 shares of Social Life stock, with a fair market value of  $8,323,398.04.

84.     In total, the aggregate fair market value of all the Social Life stock LGH acquired under the Warrant is approximately $14,417,780.88.

85.     As return on a loan of $100,000, the value of stock that LGH obtained from Social Life *from the Warrant alone* has given LGH a 14,318% return on its loan.  Annualized, the interest rate is *7,159%.*

### E.     SLN was Harmed by the Unlawful Loan

86.     As a result of LGH's unlawful loan, and with Darbie's assistance, LGH obtained millions of warrant shares to which it was not entitled.

87.     The number of shares demanded by the Warrant became so large that SLN was forced to increase its authorized shares, and the issuance of the new stock upon exercise of the warrants massively diluted SLN's shareholders.   These shareholders were ultimately left with only 1.7% of what they had owned in April 2019.

88.     Once LGH exercised the warrants, LGH's immediate and massive selling of the large blocks of newly issued shares into the public market caused enormous depression in the stock price, which even at this time is reduced by 96%, compared to April 2019.

89.     As a result of LGH's actions, it became increasingly difficult for SLN to raise money from other entities; other toxic lenders became the only available option for short-term financing, which led to more losses and more dilution.  This is the classic "death-spiral" effect caused by toxic lending.

90.    The depressed stock price also caused SLN stock to be delisted from the OTCQB market and relegated to the "pink sheet" stocks, which made conventional financing nearly impossible.

91.    Assessment of the total damage caused by LGH to SLN is difficult to quantify and would require expert testimony.

92.    In light of the difficulty of assessing damages and the equitable remedy of rescission indicated by section 29(b) of the Act, rescission of the Agreements (to return the parties to their pre-contract position) should be effectuated by mandating LGH to return to SLN every share of stock it acquired under the Warrant, and any cash payments made by SLN in excess of LGH's $100,000 loan under the Note.

93.    SLN is further entitled to statutory prejudgment interest on the value of the stock and the cash payments.

94.    In the alternative, LGH should pay rescissionary damages in an amount constituting the value of the stock wrongfully acquired and cash amounts paid, both with statutory prejudgment interest.

95.    SLN is further entitled to the return of any and all payments it made to Darbie to act as a finder in connection with the unlawful loan.

# V.

## CAUSES OF ACTION

### COUNT I:
### *Violation of the Act by LGH Investments for Effecting Transactions in Securities as an Unregistered Dealer*

96.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs 1-95 as though set forth herein.

97.    LGH Investments is a dealer within the meaning of the Securities Exchange Act of 1934 ("Act").

98.    LGH is not registered as a dealer with the SEC or with any other regulatory body, as required by Section 15(a) of the Act (15 U.S.C. § 78o(a)(1)).

99.    LGH effected transactions in securities in the April 2019 Transaction and in the Related Transactions.

100.   LGH used the means of interstate commerce to effectuate the April 2019 Transaction and the Related Transactions.

101.   As a party to the Agreements and the Related Transactions, SLN is in contractual privity with LGH.

102.   As a stock issuer, SLN is within the class of persons that the Act was designed to protect.

103.   The Agreements and the Related Agreements were made in violation of section 15(a) of the Act (15 U.S.C. § 78o), which prohibits unregistered broker dealers from using any means of interstate commerce to effect transactions in securities.

***COUNT II:***
***Violation of the Act by Hoppel as a Control***
***Person of LGH Investments, Based on LGH Investments's***
***Transactions in Securities as an Unregistered Dealer***

104.   Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs 1-103 (including Count I) as though set forth herein.

105.   Hoppel had the power and authority to cause LGH Investments to engage in the wrongful conduct described in Count I herein.

106.   Hoppel did in fact cause LGH Investments to engage in the wrongful conduct described herein.

107.   Hoppel did not act in good faith.

108.   Hoppel directly and/or indirectly induced the   acts constituting the violations in this case.

109.   Therefore, Hoppel acted as a control person of LGH Investments, LLC, within the meaning of § 20(a) of the Act, 15 U.S.C. § 78t(a).

### COUNT III:
### *Violation of California Corporations Code § 25210*
### *by LGH Investments for Effecting Transactions in*
### *Securities as an Unregistered Dealer*

110. Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs 1-95 as though set forth herein.

111. LGH Investments is a dealer within the meaning of the California Corporations Code § 25004.

112. LGH is not registered as a dealer with the SEC or with any other regulatory body, as required by California Corporations Code § 25210(a).

113. LGH effected transactions in "securities" in the April 2019 Transaction and in the Related Transactions, within the meaning of California Corporations Code § 25019.

114. LGH, through Hoppel, transacted in securities within the State of California.

115. California Corporations Code § 25210(a), parallels Section 15(a)(1) of the Act, stating in relevant part:

> Unless exempted under the provisions of Chapter 1 (commencing with Section 25200) of this part, no broker-dealer shall effect any transaction in, or induce or attempt to induce the purchase or sale of, any security in this state unless the broker-dealer has first applied for and secured from the commissioner a certificate, then in effect, authorizing that person to act in that capacity.

116.   The April 2019 Transaction and each of the Related Transactions are unlawful under California Corporations Code § 25210(a) because Defendant LGH Investments is an unregistered securities dealer.

117.   At no time while engaging in dealer activities in California was LGH Investments exempt from the dealer registration requirements.

118.   As a result of the facts described in the foregoing paragraphs, an actual controversy of sufficient immediacy exists between the parties to this action as to whether LGH Investments violated California Corporations Code § 25210 and whether the underlying agreements are void under California law.

119.   By engaging in the conduct described above, LGH Investments violated California Corporations Code § 25210.

### COUNT IV:
### Violation of California's Usury Statute (CA Civ § 1916-2) and California's State Constitution (Cal. Const., Art. XV § 1) by LGH Investments for the Loan Made in the Agreements

120.   Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs 1-95 as though set forth herein.

121.   The Note in this case constituted a loan of money absolutely repayable, either in cash on the maturity date, or in shares upon conversion at the sole option of LGH.

122.   California's State Constitution, Article XV § 1 (2), provides that "No person . . . or Corporation shall, by charging any fee, bonus, commission or other discount, receive from a borrower more than [12% apr] upon any loan . . . ."

123.   LGH charged SLN an annualized interest rate in excess of the legal rate allowed by the California constitution.

124.   The Agreements in this case were seven-month notes, with a stated interest rate of 7%.

125.   Under California law, the $10,000 OID is presumed to be interest and included in the interest calculation.

126.   The 150,000 inducement shares that Social Life was required to pay as consideration for the loan is also considered part of the interest payment.  The shares had a market value of $21,750 at the time of issuance ($0.145 per share on April 11, 2019), which was guaranteed until exercise.

127.   With the addition of the inducement-shares, the total amount that Social Life conveyed in repayment of the Note on November 11, 2019 (that is, not including the Warrants) was $139,450.  For a seven-month loan of $100,000, SLN had given an additional $39,450, translating to an interest rate of 67.6% APR.

128.   Under California law, payments to the lender in excess of the principal amount borrowed constitutes interest.

129.   Accordingly, considering only the stated rate, the OID, and the value of the inducement shares, it is evident from the face of the Note that LGH charged a 67.6% interest rate without the Warrant value.   Through the Warrants, LGH Investments received $14,417,780.80 worth of stock, in total an annualized interest rate of 7,226.6%.

130.   LGH Investments exercised the Warrant and received the payments in stock between December 7, 2020 and April 6, 2021.

131.   LGH Investments demonstrated willful intent to charge interest in excess of the lawful rate because (1) an unlawful rate may be ascertained from the face of the Agreements, and (2) the interest ultimately received by LGH Investments was so excessive that willful intent may and should be inferred.

132.   Accordingly, the provisions of the Agreements causing LGH to receive interest in excess of the maximum rate allowed by the California Constitution are null and void pursuant to the California Civil Code § 1916-2.

### COUNT V:
### *Violation of California's Doctrine of Unconscionability*
### *(CA Civ § 1670.5) by LGH Investments*

133.   Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs 1-95 as though set forth herein.

134.   Under California law, unconscionability requires both procedural and substantive unconscionability, with the procedural element focusing on "oppression" or "surprise" due to unequal bargaining power, and the substantive element focusing on "overly harsh" or "one-sided" results.   *Armendariz v. Foundation Health Psychcare Services, Inc.,* 6 P.3d 669, 670 (Cal. 2000).

135.   Under California Civil Code § 1670.5:

If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

136.   Both procedural and substantive unconscionability are present in the Agreements and in the manner that they were executed.

137.   Accordingly, the adjustment provisions contained in the Warrant are unconscionable and unlawful under California Civil Code § 1670.5.

### COUNT VI:
### Unjust Enrichment Against All Defendants

138.   Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs 1-95 as though set forth herein.

139.   The Defendants have received valuable benefits from Social Life, including *inter alia,* stock and payment to Darbie for arranging the April 2019 Transaction.

140.   These benefits are the result of the wrongful conduct alleged herein in Counts I-V.

141.   The Defendants have unjustly retained these benefits at Social Life's expense.

142.   As a result, the Defendants have been unjustly enriched.

### COUNT VII:
### Constructive Trust Against the LGH Defendants

143.   Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs 1-95 and 139-42 (including Count VI) as though set forth herein.

144.   As alleged in Count VI, the LGH Defendants have been unjustly enriched by SLN.

145.   The circumstances are such that it would be inequitable for the LGH Defendants to retain the property conferred on them by Social Life.

146.   Social Life has a specific, identifiable interest in the property unjustly retained by the LGH Defendants as a result of the April 2019 Transaction and Related Transactions.

147.   The LGH Defendants have wrongfully acquired and detained Social Life's property obtained via the April 2019 Transaction and Related Transactions.

148.   Allowing the LGH Defendants to retain the property conferred on them by SLN would inequitably allow the LGH Defendants to profit from their own wrongdoing, and to dispose of said property for their own purposes including without limitation paying their attorney's fees and costs in connection with this action, and engaging in additional unlawful transactions of the type giving rise to this action.

149.   As a result, a constructive trust should be imposed on Social Life's property retained by the LGH Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Social Life seeks a Verdict and Judgment against the Defendants herein as follows.

1. Count I (Against LGH Investments):

   a. Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, Social Life requests the Court to declare that:

      i.   The Agreements and Related Transactions are transactions in securities within the meaning set forth in the Securities Exchange Act of 1934 ("Act"), 15 U.S.C. 78c(a);

      ii.   LGH Investments is operating as an unregistered dealer in securities, in violation of the Act, 15 U.S.C. § 78o;

     iii.   The Agreements are void and subject to rescission under the Act, 15 U.S.C. § 78cc; and

     iv.   LGH Investments is entitled to retain the principal amount of the loan made pursuant to the Agreements, already repaid by Social Life.

  b.  Social Life requests that the Court enter an Order:

      i.   Rescinding the Agreements pursuant to the Act, 15 U.S.C. § 78cc;

      ii.   Awarding rescissionary damages and such other relief as the Court deems just and equitable to effectuate the voiding and rescission of the Agreements;

     iii.   Requiring LGH Investments to return to SLN all SLN stock obtained via the Warrant;

     iv.   Requiring LGH Investments to return to SLN the amount of $39,450, the interest payment prior to Warrant exercise; and

      v.   Awarding statutory prejudgment interest on any monetary award and on the value of any stock obtained via the Warrant.

2.  Count II (Against Defendant Hoppel):

a. Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, Social Life requests the Court to declare that:

 i. Hoppel had the power and authority to cause LGH Investments to engage in the wrongful conduct described in Count I herein;

 ii. Hoppel did in fact cause LGH Investments to engage in the wrongful conduct described in Count I herein; and

 iii. Hoppel acted as a control person of LGH Investments, LLC, within the meaning of § 20(a) of the Act, 15 U.S.C. § 78t(a)

b. Social Life requests that the Court enter an Order,  pursuant to § 20(a) of the Act, 15 U.S.C. § 78t(a), holding Hoppel jointly and severally liable with and to the same extent as LGH Investments is liable to Social Life in Count I herein.

3. Count III (Against LGH Investments):

a. Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, Social Life requests the Court to declare that:

 i. The Agreements and Related Transactions are transactions in securities within the meaning of the California Corporations Code § 25210;

 ii. LGH Investments is in violation of the California Corporations Code § 25210, by acting as an unregistered dealer in securities;

  iii. The Agreements are void and subject to rescission under the California Corporations Code § 25501.5; and

  iv. LGH Investments is entitled to retain the principal amount of the loan made pursuant to the Agreements, already repaid by Social Life.

 b. Social Life requests that the Court enter an Order:

  i. Rescinding the Agreements pursuant to the California Corporations Code § 25210;

  ii. Awarding rescissionary damages and such other relief as the Court deems just and equitable to effectuate the voiding and rescission of the Agreements;

  iii. Requiring LGH Investments to return to SLN all SLN stock obtained via the Warrant;

  iv. Requiring LGH Investments to return to SLN the amount of $39,450, the interest payment prior to exercise of the Warrant; and

  v. Awarding statutory prejudgment interest on any monetary award and on the value of any stock obtained via the Warrant.

4. Count IV (Against LGH Investments):

a. Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, Social Life requests the Court to declare that:

   i. Under the Agreements, LGH Investments made a loan charging an interest rate in excess of the maximum rate allowed by the California Constitution;

   ii. The provisions of the Agreements causing LGH to receive interest payments in excess of the maximum rate allowed by the California Constitution are null and void pursuant to California Civil Code § 1916-2; and

   iii. In the previous year and pursuant to Warrant rights granted by the Agreement, LGH has received shares of stock with a fair market value of $14,417,780.88;

b. Social Life requests that the Court enter an Order,

   i. Requiring LGH Investments to reimburse SLN for the $39,450 in interest that SLN paid to LGH Investments upon repayment of the Note; and

   ii. Pursuant to California Civil Code § 1916-3, awarding treble damages for the amount of all interest payments received by LGH Investments in the previous year, *i.e.* $43,253,342.64.

5. Count V (Against LGH Investments):

a. Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, Social Life requests the Court to declare that the "adjustment provisions" in the Warrant -- other than those pertaining to stock splits and reverse splits -- are unconscionable and unlawful under California Civil Code § 1670.5.

b. Social Life requests that the Court enter an Order, pursuant to California Civil Code § 1670.5:

   i. Striking from the Warrant the "adjustment provisions" other than those pertaining to stock splits and reverse splits;

   ii. Ordering that LGH Investments return to SLN all stock that LGH Investments obtained through the operation of the stricken "adjustment provisions," *i.e.* via Warrant exercise, between December 2020 and the date of the Court's Order;

   iii. Ordering that, in lieu of stock, LGH Investments may compensate Social Life for the fair market value of the stock obtained by LGH Investments via operation of the stricken "adjustment provisions;" and

   iv. Ordering that LGH Investments retain its five-year Warrant (of which approximately three years remain) for the purchase of 412,500 shares of Social Life stock with an exercise price of $.20

per share, and permitting adjustments only for stock splits and reverse splits (of which, to date, there have been none).

6. Count VI (Against All Defendants):

   a. Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, Social Life requests the Court to declare that:

      i. Defendants have voluntarily accepted and retained the property conferred by Social Life on the LGH Defendantsthrough and as a result of violations of the Securities Exchange Act of 1934 (15 U.S.C. § 78o), the California Corporations Code § 25210; and the Civil Code of California, § 1916-2, and on Darbie as a result of the payment it received for arranging the unlawful April 2019 Transaction; and

      ii. The circumstances are such that it would be inequitable for the Defendants to retain the property conferred on them by Social Life without first paying the value thereof to Social Life, to prevent the Defendants from being unjustly enriched;

   b. Social Life requests that the Court enter an Order requiring the Defendants to return to SLN the value of the property they have unjustly retained.

7. Count VII (Against the LGH Defendants):

a. Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, Social Life requests the Court to declare that the LGH Defendants have been unjustly enriched as alleged in Count VI; and

b. Social Life requests that the Court enter an Order imposing a constructive trust on Social Life's property in the possession of the LGH Defendants as a result of the property conferred on them by Social Life.

8. As to each of the foregoing Counts 1-VII, to the extent permitted by applicable law, and not otherwise requested, Social Life requests that the Court enter an Order:

a. Awarding Social Life compensatory, direct, and consequential damages;

b. Awarding Social Life punitive and/or treble damages, to deter the Defendants from continuing to engage in the same wrongful and unlawful transactions;

c. Awarding Social Life its attorney fees and costs associated with this litigation;

d. Entering any award of monetary damages jointly and severally against the Defendants;

e.  Awarding such further and additional legal and equitable relief that the

Court deems just, proper, and in the interest of justice.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues properly so tried.


Dated:  July 16,  2021

/s/ Shawn Leo
Shawn Leo, Esq.
**LEO LAW OFFICE, APLC**
401 West A Street, Ste. 1150
San Diego, CA 92101
Tel.:    (858) 284-0660
Email: sleo@leolawoffice.com

Mark R. Basile, Esq. (pro hac vice)
Eric J. Benzenberg, Esq. (pro hac
vice)
**THE BASILE LAW FIRM, P.C.**
390 N. Broadway, Ste. 140
Jericho, NY 11753
Tel.:    (516) 455-1500 x110
Email: mark@thebasilelawfirm.com
eric@thebasilelawfirm.com

Robert J. Young, Esq.
**LAW OFFICES OF ROBERT J.
YOUNG**
**11664 National Blvd. Ste. 441**
**Los Angeles, CA 90064**
**Tel.:    (310) 567-8644**
**Email:  rjy24@aol.com**

1

**Attorneys for Plaintiff Social Life Network, Inc.**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28